MICHEL, Chief Judge,
dissenting-in-part.
I write separately to voice my strong disagreement with the majority’s holdings that (1) contrary to the district court’s construction, “therapeutically effective” in claim 1 of the ’422 patent means simply eliciting in vivo biological effects even if not tending to cure certain diseases and (2) claim 1 of the ’422 patent could therefore be invalid in light of the Goldwasser reference, which describes a prior art compound eliciting biological activity without curing. Because the majority concludes that the district court erred in construing “therapeutically effective” to mean having *1318 a disease-curing effect, it remands the case for a re-adjudication of whether the Gold-wasser reference anticipates claim 1 of this particular patent, only one of several asserted.
At the outset, I compliment the district court for the meticulous attention it has given to this extraordinarily complicated, highly-technical, and very difficult case. The district court’s two opinions on remand, the subject of our present review, were well-reasoned, well-grounded in the evidence, and well-written. The trial court clearly exerted tremendous effort to carefully consider all the issues raised by the parties as well as our remand instructions in Amgen II.
After discovery, the district court conducted a three-day Markman hearing and a bench trial spanning twenty-three days in 2000 and then, following our remand, a second Markman hearing and second bench trial spanning nine days in 2003. The district court also took the creative steps of employing Professor Chris Kaiser of the Massachusetts Institute of Technology as a technical advisor on the underlying technology and Michele D. Beardslee as a special master to aid in researching the law, analyzing the issues, and drafting the remand opinion. Assisted by them, the district court spent more than ten months rendering its revised claim constructions and making extensive findings of fact and conclusions of law; it subsequently issued two opinions, together totaling over 360 pages.* Plainly, these decisions were not reached in a haphazard or hurried manner by a court intimidated by either the science or the law. On the contrary, the district court’s management and resolution of this case is, I think, a model for all trial courts confronted with such patent suits.
I.
The district court construed “therapeutically effective amount” to mean “a quantity that produces a result that in and of itself helps to heal or cure.” Amgen III Validity & Literal Infringement Judgment, 339 F.Supp.2d at 245. It further elaborated that a therapeutically effective amount would elicit certain in vivo biological effects, such as those described in the specification, col. 33, ll. 17-22, (i.e., stimulation of reticulocyte response, development of ferrokinetic effects, erythrocyte mass changes, stimulation of hemoglobin C synthesis, and increasing hematocrit levels), which reflect a “healing” or “curing” effect in “patients generally requiring blood transfusions and including trauma victims, surgical patients, renal disease patients including dialysis patients, and patients with a variety of blood composition affecting disorders, such as hemophilia, sickle cell disease, physiological anemias, and the like.” ’422 patent, col. 33, ll. 23-28. I believe the court correctly recognized that merely eliciting a biological effect is not the same as being therapeutically effective.
Indeed, prior art compounds could trigger the very in vivo biological effects enumerated in the specification but were utterly incapable of “healing” or “curing” the class of patients described in the ’422 patent. Notably, an article published in the Renal Extrarenal Sources of Erythropoiet-in Journal in 1971 revealed that a patient suffering from renal anemia was treated with an urinary EPO preparation but, despite experiencing an increase in reticulo-cytes, died five days later. The district court was particularly aware of this article and even mentioned it when addressing the issue of obviousness after the first bench trial. See Amgen I, 126 F.Supp.2d *1319 at 116. Had this uEPO or any other prior art EPO product been shown to “heal” or “cure” anemia or similar blood disorders, there would have been little need for the claimed invention.
When a compound is truly “therapeutically effective,” that is, when it “heals” or “cures” such a blood disorder, it necessarily increases hematocrit as well as causes one or more of the other listed in vivo biological effects. Reading lines 17-22 of column 33 in context, the patentee clearly recognized this.
As previously indicated, recombinant-produced and synthetic products of the invention share, to varying degrees, the in vitro biological activity of EPO isolates from natural sources and consequently are projected to have utility as substitutes for EPO isolates in culture media employed for growth of erythro-poietin cells in culture. Similarly, to the extent that polypeptide products of the invention share the in vivo activity of natural EPO isolates they are conspicuously suitable for use in erythropoietin therapy procedures practiced on mammals, including humans, to develop any or all of the effects herefore attributed in vivo to EPO, e.g., ... and, as indicated in Example 10, increasing hematocrit levels in mammals.
’422 patent, col. 33, ll. 6-22 (emphasis added). This disclosure clarifies three aspects of the claimed invention. First, the claimed EPO shares the in vitro biological activity of natural EPO. Second, the claimed EPO elicits the very same in vivo activity as natural EPO and, therefore, is suitable for use in EPO therapy procedures. Third, the claimed EPO increases hematocrit in mammals, as exemplified in Example 10 of the ’422 patent. By reciting “therapeutically effective amount of human erythropoietin,” the patentee thus demonstrated an intention to claim EPO that (1) causes the same in vivo biological effects as the natural EPO; and also (2) increases hematocrit.
The subsequent disclosure strengthens my view that the district court correctly construed the “therapeutically effective” limitation.
A preferred method for administration of polypeptide products of the invention is by parenteral (e.g., IV, IM, SC, or IP) routes and the compositions administered would ordinarily include therapeti-tically effective amounts of product in combination with acceptable diluents, carriers and/or adjuvants.... Effective dosages are expected to vary substantially depending upon the condition treated but therapeutic doses are presently expected to be in the range of 0.1(-70) to 100 (-7000 U) irgdig body weight of the active material.
’422 patent, col. 33, ll. 41-52 (emphasis added). In the only part of the specification where the term “therapeutically effective” actually appears, the patentee uses the term in the ordinary sense of the phrase to mean promoting “healing” or “curing.” That is, the patentee teaches the preferred amount of EPO product and a preferred method of administration for a patient suffering from a disorder characterized by a low red blood cell count. Inherently, the ultimate goal is to “heal” or “cure” the disorder. That healing is characterized by an increased red blood cell count, i.e., a higher hematocrit level.
Significantly, I note that the words “therapeutically effective” are conventionally employed in the pharmaceutical arts to indicate that the claimed pharmaceutical product has utility in the treatment of a human disease where such treatment tends to cause the “healing” or “curing” of the disease. The patentee, I think, intended to invoke that very convention. While the majority might be correct that the ’422 *1320 patent is not necessarily limited to the exact class of patients described in the specification (as opposed to other blood disorders associated with low hematocrit levels), the district court correctly recognized that it would be “foolish to construe a term such as ‘therapeutically effective,’ without reference to a class of patients for which the product is intended to be ‘therapeutically effective.’ ” Amgen III Validity & Literal Infringement Judgment, 339 F.Supp.2d at 237.
The specification further discloses various analogs of EPO at columns 35-36:
In addition to naturally-occurring allelic forms of mature EPO, the present invention also embraces other “EPO products” such as polypeptide analogs of EPO and fragments of “mature” EPO.... Especially significant in this regard are those potential fragments of EPO which are elucidated upon consideration of the human genomic DNA sequence of FIG. 6, i.e., “fragment” of the total continuous EPO sequence which are delineated by intron sequences and which may constitute distinct “domains” of biological activity. It is noteworthy that the absence of in vivo activity for any one or more of the “EPO products” of the invention is not wholly preclusive of therapeutic utility (see, Weiland, et. al., supra) or of utility in other contexts, such as in EPO assays or EPO antagonism.
’422 patent, col. 35, ll. 34-37; col. 36, ll. 4-14. The majority mistakenly relies on this disclosure to support its view that the “therapeutically effective” means merely capable of triggering any in vivo biological activity, regardless of degree. Correctly read, the emphasized passage plainly concerns only analogs of EPO, not the EPO of claim 1. That is, the full disclosure teaches that analogs of EPO may offer therapeutic utility even though they may not have in vivo activity. The emphasized sentence says nothing about the claimed EPO and hence cannot be relied upon to construe the “therapeutically effective” limitation.
The prosecution history further confirms that “therapeutically effective” connotes more than simply eliciting any cited in vivo biological effect. The district court emphasized that during prosecution of the ’422 patent, the patentee differentiated its invention from natural EPO, which also elicits the aforementioned biological activity, on the basis that the latter was not available in large enough quantities to treat patients, i.e., help cure their diseases. Amgen III Validity & Literal Infringement Judgment, 339 F.Supp.2d at 239. Likewise, during the prosecution of the Application No. 07/113,178, a parent application of the ’422 patent which itself issued as United States Patent No. 5,441,868, the patentee distinguished the claimed EPO from the prior art, emphasizing that the claimed EPO could be used as a therapeutic product to treat humans with blood disorders characterized by a low red blood cell count whereas the prior art EPO could not. In particular, the patentee stated:
[Njaturally occurring human erythro-poietin is not a viable human therapeutic product; human recombinant erythro-poietin, on the other hand, has been proved to be clinically effective, and is the first therapeutic product which can be used to effectively treat the hundreds of thousands of patients who suffer from anemia and other disorders involving low red blood cell counts.
In so differentiating the claimed EPO from the prior art, the patentee said that the claimed EPO is capable of doing more, i.e., the claimed EPO “heals” or “cures” anemia and other such disorders by raising a patient’s red blood cell count.
Thereafter, during the prosecution of the Application No. 08/100,197, a continua *1321 tion of Application No. 07/113, 178 discussed above, the examiner objected that “Claim 62 is vague and indefinite because it is unclear what the claimed composition is required to be ‘effective’ for.” In response, after quoting column 33, lines 11-28, which includes a description of the in vivo biological effects, the “increasing he-matocrit” language, and various diseases treatable with the claimed invention, the patentee again explained that the claimed EPO could be used to treat, (i.e., “heal” or “cure”), various blood disorders:
It is believed that these sentences from the specification and others provide a clear and definite description of the uses for which the claimed erythropoietin compositions would be therapeutically effective. A person of skill in the art would understand that the amount of erythropoietin necessary to achieve these defined therapeutic results would vary for each use. However, clinicians can readily determine the “therapeutically effective” amounts for each condition, and indeed for each patient. Application submits that the claim language “therapeutically effective amount” is commonly used in this type of case where the product is usable to treat various conditions.
(emphasis added). Accordingly, I must conclude that the district court’s construction of the “therapeutically effective” limitation comports with the patentee’s own repeated descriptions of the claimed invention. It is exactly the way a skilled artisan would interpret the patent, as the district court held.
II.
Regarding possible anticipation of the invention of the ’422 patent by the Gold-wasser reference, the district court set forth very specific reasons why none of the in vivo biological effects mentioned in the Goldwasser reference (i.e., an increase re-ticulocytes, an increase in plasma iron clearance, and red cell mass changes) demonstrated therapeutic effectiveness. HMR does not contend that the district court clearly erred. Rather, it merely asserts that all of these biological results fall under its proposed claim construction for the term “therapeutically effective amount,” which is any amount of EPO that elicits any in vivo biological effect, even if not accompanied by an increased hematocrit. Because I think that the district court correctly rejected HMR’s proposed construction and properly construed “therapeutically effective” to mean “healing” or “curing,” HMR’s validity challenge necessarily fails. While all of the results described in the Goldwasser reference represent in vivo biological responses, none demonstrate that the subject anemic patients were even partially “healed” or “cured.” In fact, Dr. Goldwasser himself considered his study a failure because the patients’ hematocrit levels did not increase. I therefore conclude that the district court correctly found that the Gold-wasser reference does not anticipate claim 1 of the ’422 patent. Clear error has not been shown. We should therefore affirm the judgment as to validity.
III.
This litigation has already dragged on for almost ten years, yet the end is nowhere in sight. The majority again remands this case to the district court, this time for a re-adjudication of whether the Goldwasser reference anticipates claim 1 of the ’422 patent in light of its revised construction of “therapeutically effective.” The district court, as a result, will conduct further proceedings and render a third opinion. Inevitably, at least one party will appeal that judgment, prompting a third review by this Court. We, in turn, will issue another opinion, perhaps even remanding the case a third time. The district court, however, has yet to decide whether to grant an injunction, the specific *1322 relief sought by the patentee. Presumably, after our decision in that potential third appeal, the district court would conduct a trial or hearing on that issue and reach another decision, which will likely be appealed by one or both of the parties. We consequently would hear a fourth appeal and issue a fourth decision, which could involve yet another remand. When will it end? Ironically, the patents in dispute may expire before this litigation concludes.
Moreover, since the majority holds that other asserted patents are not invalid and are literally infringed by HMR 4396, (and here I agree), the district court likely will enter an injunction precluding appellants from marketing HMR 4396 until the expiration of at least the ’698 and ’349 patents. Prolonging this litigation seems futile when, in the end, an injunction will likely issue regardless of how “therapeutically effective” is construed or whether claim 1 of the ’422 patent is invalid.

 The district court’s original opinion in this case contained 244 pages.